NO. 83-407

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

CHESTER R. BAUER,

Defendant and Appellant.

Appeal from: District Court of the Second Judicial District,
In and for the County of Silver Bow,
Honorable Mark P. Sullivan, Judge presiding.

Counsel of Record:

For Appellant·

Dunlap and Caughlin, Butte, Montana
Deidre Caughlin argued, Butte, Montana

For Respondent:

Honorable Mike Greely, Attorney General, Helena,
Montana
Robert M. McCarthy, County Attorney, Butte, Montana
Patrick Fleming argued, Chief Deputy County Attorney,
Butte, Montana
Ross Richardson argued, Deputy County Attorney, Butte,
Montana

Submitted: February 27, 1984

Decided: June 4, 1984

Filed: JUN 4 - 1984

Ethel M. Harrison

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Defendant Chester Bauer appeals from his convictions in the District Court of the Second Judicial District, Silver Bow County, on charges of sexual intercourse without consent and aggravated assault. We affirm.

On January 26, 1983, D. K. was forcibly raped at knife point in her Butte, Montana, home. The rapist, identified by D. K. as the defendant, Chester Bauer, had come to the home in the late afternoon inquiring as to whether D. K. and her husband wanted to sell their boat. Apparently Bauer had visited the couple about ten days earlier to inquire about the same boat. On the day of the rape, Bauer asked D. K., who was home with her children, for a piece of paper to write down information about the boat. She went to the kitchen, and he followed. When she turned toward him, Bauer brandished a knife. The children were ushered into their rooms, and Bauer took D. K. into her bedroom and raped her.

After the rape and Bauer's departure from the home, D. K. called the police. Detectives Dave Gertz and Tom Green arrived at the scene, seized all the bedding from the bed where the rape had taken place, and escorted D. K. to the hospital where the staff acquired pubic hair and blood samples and took vaginal swabs to secure semen samples. The samples were tested by serologist Julie Long.

In the meantime, detectives were seeking the whereabouts of the rapist. Within a week of the incident, the investigation began focusing on Chester Bauer. Detective Gertz approached Bauer on February 2 and asked him if he would agree to have a current photograph taken so that police could update their mugbooks. Bauer, who had had a previous

2

encounter with the police, agreed. The police used the new photograph and an old one, taken in 1977, to construct two separate photographic lineups. Bauer's picture appeared in both line-ups, and his pictures were the only ones bearing the words "Police Dept. Butte, Montana."

D. K. was called in to see if she could identify her attacker from the line-ups. Her husband was asked to see if any of the "suspects" matched the description of the man who had come to the home asking about the boat. D. K. was unable to make a positive identification of her attacker, but showed an interest in both photographs of Bauer. The husband made a positive identification of Bauer as the man who had come to the home about ten days before the rape.

On February 22, Bauer voluntarily consented to appear in a physical line-up. According to Detective Gertz, the line-up consisted of six white males, all of whom had similar physical characteristics. No photograph of the line-up was taken because the police camera was unavailable. At the line-up, D. K. made an immediate positive identification of Bauer as the man who had raped her. During the trial, she again identified him as the rapist.

Bauer was charged with sexual intercourse without consent and aggravated assault, and was convicted of both crimes. A motion for new trial was denied. From the jury verdict and denial of the motion for new trial, Bauer appeals, raising four issues:

(1) Whether the photographic line-ups were "impermissibly suggestive" and gave rise to an "irreparable misidentification" at the subsequent physical line-up and at trial?

3

(2) Whether the expert testimony of serologist Julie Long was more prejudicial than probative and therefore should have been excluded?

(3) Whether the trial court erred by not striking Detective Gertz's testimony regarding Bauer's spontaneous remarks made at the time of his arrest?

(4) Whether a juror's failure during voir dire to disclose her family relationship to a Butte-Silver Bow jailor severely impaired Bauer's right to a fair and impartial jury?

Collateral facts relevant to each issue but not mentioned previously are set forth in the discussion below.


WHETHER THE PHOTOGRAPHIC LINE-UPS WERE "IMPERMISSIBLY SUGGESTIVE" AND GAVE RISE TO "IRREPARABLE MISIDENTIFICATION" AT THE SUBSEQUENT PHYSICAL LINE-UP AND AT TRIAL?

Prior to trial, the court granted Bauer's motion to exclude evidence of the attempt at photographic identification of Bauer by D. K. The court denied a similar motion to suppress evidence of the physical line-up conducted February 22 and also denied a motion to prevent any in-court identification of Bauer by D. K. or her husband. Bauer insists that denial of these latter motions by the court was erroneous because (1) the two photographic line-ups shown to D. K. tainted her recollection of her attacker so as to interfere with any subsequent identification; (2) the same arrays were so suggestive and conducive to irreparable misidentification that any identification would be inherently unreliable; (3) there is no reliable means of determining the fairness of the physical line-up; and (4) any in-court identification would have no source independent from the previous photographic and physical line-ups. In essence, Bauer argues that the

4

identifications made at the physical line-up and during trial are tainted by previous attempts at identification.

This Court follows a two-pronged test when deciding the propriety of admitting evidence of an in-court identification and/or the results of some prior line-up:

> "First, [whether] . . . the identification procedure [was] impermissibly suggestive; and second, if so, [whether] . . . under the totality of the circumstances [the procedure had] . . . such a tendency to give rise to a substantial likelihood of irreparable misidentification that to allow the witness to make an in-court identification would violate due process. [Citations omitted.]" State v. Lara (1978), 179 Mont. 201, 205, 587 P.2d 930, 932.

See also State v. Herrera (1982), 197 Mont. 462, 466, 643 P.2d 588, 590.

Initially we decide whether the identification procedures utilized in the case were "impermissibly suggestive." With respect to the photographic arrays, we recognize that only defendant Bauer's photographs bear the inscription, "Police Dept., Butte, Montana." Nevertheless, the trial court was not convinced, and neither are we, that this fact alone amounts to impermissible suggestiveness. While it is true that D. K. was present when her husband positively identified Bauer as the man who had been at the family home several days before the rape inquiring about the boat, it must be emphasized that D. K. was unable to make a positive identification of Bauer from the photographic arrays. She only "showed interest" in Bauer's pictures.

Insofar as the physical line-up is concerned, we again find no evidence of impropriety. Detectives Gertz and Green testified as to the procedures used in the line-up, and no testimony was offered by Bauer or others to controvert the

5

Hon. L. C. Gulbrandson
Justice, Supreme Court
Room 436 Justice Bldg.
215 North Sanders
Helena, Montana  59620

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

August 6, 1984

State v. Bauer, No. 83-407, June 4, 1984



OK

Page 6, line 8 from bottom -- 350 U.S. 377 should read 390 U.S. 377.

Page 12, line 5 -- 83 P.2d 886 should read 83 P. 886. (Also cited on line 14, same page).

Page 13, line 6 from bottom -- People v. Borellis should read People v. Borrelli.

WEST PUBLISHING COMPANY
Box 43526
St. Paul, MN 55164

observations made by the detectives. Therefore we are satisfied that the first prong of the Lara test has been met. Even if we assume, for the purpose of argument, that Bauer's concerns about suggestiveness have some credence, we find no error in admitting evidence of the subsequent identifications because, following the second prong of Lara, we conclude that the photographic line-ups did not give rise to an irreparable misidentification.

In State v. Higley (Mont. 1980), 621 P.2d 1043, 1049, 37 St. Rep. 1942, 1947, this Court identified the important criteria for evaluating the likelihood of misidentification. These factors, first set out by the United States Supreme Court in Neil v. Biggers (1970), 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411, are (1) opportunity of the witnesses to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.

D. K. testified that Bauer was in her home from five to ten minutes before he made his move. In Simmons v. United States (1968), 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, witness identification of a bank robber who was in the bank for approximately five minutes was permitted, the Court finding that the five minutes afforded witnesses ample opportunity to view the robbers. It should be emphasized that, in the instant case, D. K. also took fleeting glances of her attacker while the rape was taking place and while he forced her to kiss him.

Her degree of attention was also very high. The pair stood and conversed about the boat before the attack. In the bedroom, she was at first standing while facing him, kissing him against her will, and then was seated naked on the bed facing him before the rape. It cannot be discounted that she also answered the door seven to ten days before when he came to inquire about the boat.

The record does not contain D. K.'s original description of the rapist. Nevertheless, defense counsel on cross-examination alleged only one inconsistency between Bauer's features and the description. The "inconsistency" was that in her statement, D. K. stated that the attacker had "medium brown" hair, and then on the stand said his hair appeared "dishwater blonde." Apparently all other features described—height, weight, age, lack of distinctive facial scars—matched those of the defendant.

The level of certainty demonstrated at the physical line-up was uncontradicted. D. K. immediately identified "No. 5" (Bauer) as soon as the curtain was opened. She never wavered after all the "suspects" were required to approach the glass (a two-way mirror) and speak phrases that were spoken by the rapist.

The length of time between the rape and the physical line-up was less than one month. The rape occurred on January 26, 1983, and the physical line-up was conducted on February 22, 1983, with the defendant voluntarily present.

Considering the totality of the circumstances, we cannot say that the photographic line-ups gave rise to an "irreparable misidentification." The trial court did not err by denying exclusion of evidence pertaining to the physical line-up and in-court identifications.

7

WHETHER THE EXPERT TESTIMONY OF SEROLOGIST JULIE LONG WAS MORE PREJUDICIAL THAN PROBATIVE AND THEREFORE SHOULD HAVE BEEN EXCLUDED?

Rule 702, Mont.R.Evid., allows introduction of "scientific" evidence via the testimony of an expert witness if the trial court concludes that the evidence will "assist the trier of fact." Of course, any evidence that would be more prejudicial to the defendant than probative of a relevant issue would be inadmissible. This is Bauer's position regarding the testimony of the State serologist, Julie Long.

The serologist testified to the results of tests performed on (1) D. K.'s stained underwear, (2) saliva and blood samples taken from Bauer, D. K. and D. K.'s husband, (3) the vaginal swabs taken at the hospital, and (4) the sanitary napkin D. K. was wearing the day of the rape. The tests identify various "genetic markers" that distinguish one individual from another. The tests involved here identified body substances as either semen or vaginal fluid, and also identified blood types, PGM subtypes (an enzyme present in all human cells that has varying chemical characteristics-- e.g., subtypes), and "H" factors present in body fluids which are secreted.

Long testified that the tests showed that the woman had had sexual intercourse no longer than four to six hours before the vaginal swabs were taken, and that the intercourse had been with a male secretor with blood type O, and PGM subtypes 1+1+. Bauer has blood type O, is a secretor, and has PGM subtype 1+1+. The percentage of males with those genetic markers is 7.15 percent. Bauer contends the "H" factor (secretor status) should not be calculated into the field statistic because D. K. was a secretor as well, and by

excluding that factor, the field expands to 19.8 percent of the male population. Nevertheless, the fact remains that Bauer is a secretor, and that should be relevant. Furthermore, D. K.'s husband, who had been at work all day January 26, the time of the rape, has blood type A, is a non-secretor, and has a PGM subtype of 1+1-, different from Bauer in all respects.

Bauer contends that the reasoning applied by the Court of Appeals of New York in two cases, People v. Robinson (1970), 27 N.Y.2d 864, 265 N.E.2d 543, 317 N.Y.S.2d 19 and People v. Macedonio (1977), 42 N.Y.2d 944, 366 N.E.2d 1355, 397 N.Y.S.2d 1002, mandates that the expert testimony admitted against him be excluded. In Robinson, supra, the New York high court concluded that evidence of defendant's blood type, introduced in a rape-murder case, was not probative in view of the large portion of the general population having the same blood type. The defendant's conviction was not reversed, but only because other independent evidence pointing to his guilt was compelling. In Macedonio, supra, the defendant's conviction was reversed because of the introduction of evidence of his blood type.

Robinson and Macedonio involved evidence of a blood type in an area consisting of several million people with the same blood type. In the immediate case, the evidence of blood type, secretor status and PGM subtype correlates with the significantly smaller population area of Silver Bow County. Moreover, as in the Robinson case, there is other independent evidence of Bauer's guilt. D. K. and her husband made positive identifications implicating Bauer directly or indirectly. Arnold Melnikoff, Bureau Chief of the State Crime Laboratory, testified that pubic hair and head hair

9

found at the crime scene were similar to Bauer's pubic and head hair. Melnikoff estimated that the chances of another person having the same type of pubic and head hair were one in ten thousand. Finally, Bauer's alibi defense was discredited by prosecutors. On balance, we conclude that the evidence adduced through the testimony of Julie Long was admissible.

WHETHER THE TRIAL COURT ERRED BY NOT STRIKING DETECTIVE GERTZ'S TESTIMONY REGARDING BAUER'S SPONTANEOUS REMARKS MADE AT THE TIME OF HIS ARREST?

During his direct examination of Detective Gertz, prosecuting attorney Patrick Fleming asked Gertz to explain the events leading up to and including Bauer's arrest. Fleming asked Gertz if Bauer had made any statements. Defense counsel objected on grounds of hearsay, but the court was prepared to accept evidence of immediate statements under the "excited utterance" exception to the hearsay rule. The prosecuting attorney then asked Gertz if Bauer had said anything. According to Gertz, Bauer's statement upon learning that he was under arrest was "Which bitch did it?"

Defense counsel raised no immediate objection upon hearing the statement, but later made a motion to strike during her cross-examination of Gertz concerning the statement. The motion was denied. On appeal, Bauer argues that the trial court erred by not striking the statement.

In preparing for trial, defense counsel moved under Sections 46-15-301, -302, and -303, MCA, to make discovery of several items, including "copies of all written statements of the Defendant or admissions of the Defendant taken at any time . . . " Defendant contends the remark in question was a

10

type of admission, and that it inferred fear of reprisal from more than one woman. Defendant maintains the inference to other women implied the existence of evidence of other acts or wrongs which would have been inadmissible under State v. Just (1979), 184 Mont. 262, 602 P.2d 957.

The inference in Bauer's argument is that the statement may have been deliberately concealed. During oral argument on appeal, this Court inquired into the State's knowledge of the statement. Mr. Fleming, the chief prosecutor, indicated that he had no knowledge of the statement prior to trial. He said that Gertz was told to review his notes and recollections and be prepared to answer questions about the investigation and arrest. Gertz did not tell Fleming about the statement, and Gertz indicated that defense counsel never asked him about any statements made by Bauer immediately following his arrest. The record supports Fleming's claim that, once Gertz related Bauer's utterance, the State never pursued the statement further. Neither Fleming nor his co-counsel discussed the statement during closing arguments to the jury. Both men focused only on the physical evidence, identifications, and refutation of Bauer's alibi defense. Only defense counsel dwelled on the statement during examination of witnesses and closing argument, by attempting to prove that the statement had never been made. Indeed, Bauer's wife, who was present at his arrest, denied that the statement had ever been made. Bauer's motion for new trial was not based on the statement having been revealed.

Based on our examination of the record and consideration of remarks made during oral argument, we are satisfied that the prosecution neither deliberately concealed the statement nor attempted to use it as part of its case against

Bauer. Similarly, we are disinclined to review Bauer's concerns about the statement on appeal, primarily because the motion to strike the statement was untimely made. In Poindexter & Orr Livestock Co. v. Oregon Short Line Ry. (1905), 33 Mont. 338, 83 P.2d 886, under facts very similar to those involved here, opposing counsel did not move to strike objectionable statements until after cross-examination of the witness who made the statements was completed. We held that "'[t]he practice, whether in civil or criminal cases, of deliberately permitting evidence to be given without objection in the first instance, and then moving to strike it on grounds which might readily have been availed of to exclude it when offered, is not to be tolerated.'" Poindexter, supra, 33 Mont. at 341, 83 P.2d at 887. (Citation omitted.) (Emphasis added.) This proposition was most recently reaffirmed in State v. Cripps (1978), 177 Mont. 410, 582 P.2d 312, a case involving incriminating statements not revealed in a discovery order but not objected to until well after their introduction into evidence.

Because defense counsel's motion to strike in the immediate case was untimely made, we conclude that the District Court did not err in denying the motion. Even if we were to focus on the allegations of prejudice arising from the making of the statement, we would still conclude that defendant Bauer is not entitled to relief. As we emphasized in State v. Wells (Mont. 1983), 658 P.2d 381, 40 St.Rep. 127:

> "In a criminal case, if prejudice is alleged, it will not be presumed but must be established for the record that a substantial right was denied. State v. Dupre (1982), Mont., 650 P.2d 1381, 1386, 39 St.Rep. 1660, 1666. See also section 46-20-701, MCA. The test that this Court had adopted in determining whether the prejudicial error requires a reversal is whether there is a reasonable possibility that the inadmissible evidence might have

contributed to the conviction. State v. LaVe, supra, 174 Mont. at 407, 571 P.2d at 101; See also Chapman v. California (1967), 386 U.S. 18, 24, 87 S.Ct.824, 828, 17 L.Ed.2d 705, 710; Kotteakos v. United States (1946), 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557, 1566-1567." 658 P.2d at 388, 40 St.Rep. at 133.

Here, in light of the other evidence conclusively establishing Bauer's guilt, we find that he would have been convicted even if the statement had not been made.

WHETHER A JUROR'S FAILURE DURING VOIR DIRE TO DISCLOSE HER FAMILY RELATIONSHIP TO A BUTTE-SILVER BOW JAILOR SEVERELY IMPAIRED BAUER'S RIGHT TO A FAIR AND IMPARTIAL JURY?

Members of the jury panel were asked whether any of them ". . . (knew) any of the employees at the Butte-Silver Bow law enforcement agency," and then were asked whether any of them were "related" to or "knew closely" anyone else who was employed by a law enforcement agency "other than (in Butte)." Bauer contends he was prejudiced when juror Cathy Walsh did not disclose that her brother-in-law is one of the civilian jailors at the Butte-Silver Bow jail. Bauer's motion for new trial was based solely on this failure to disclose. The trial court denied the motion.

Other jurisdictions have held that nondisclosure of information requested by jurors is not grounds for reversal unless the non-disclosure amounts to "intentional concealment." See, e.g., People v. Dunoyair (1983), _____ Colo. _____, 660 P.2d 890; People v. Borelli (1980), _____ Colo.App. _____, 624 P.2d 900; State v. Hicks (1968), 75 Wash.2d 73, 448 P.2d 930. Here, there is nothing to show that Walsh intentionally concealed the fact of her brother-in-law's employment, and there is no allegation that Walsh ever spoke with him about the case, or displayed hostility or bias toward

Bauer. She admitted the relationship immediately after being contacted by defense counsel after trial. Without more, Walsh's omission appears to have been inadvertent and not intentional. The trial court therefore did not err in denying Bauer's motion for a new trial.

The convictions of Chester Bauer for the crimes of sexual intercourse without consent and aggravated assault are affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

14