[No. G005431. Fourth Dist., Div. Three. Apr. 19, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ALAN YORBA, Defendant and Appellant.

[Opinion certified for partial publication.*]

_____

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

COUNSEL

Handy Horiye, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Rudolph Corona, Jr., and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

CROSBY, J.—A jury convicted David Yorba of various crimes, including murder. In the published portion of this opinion, we consider and reject his complaints concerning admission of forensic and statistical evidence.

## I

In July and August 1985, 17-year-old Yorba resided with his mother, 2 sisters, and the elder sister's boyfriend in an apartment at 2082 North Nordic in Orange. During that period, Laurie Bastian lived at 2084 North Nordic. On the morning of July 3, 1985, she found her sliding glass door and rear patio gate open and her purse missing. She did not report the incident to police.

On August 15, Cindy Monnier, who lived in the same large apartment complex at 2082 Lincoln, discovered her residence had been burgled while she was away the previous evening. Various items were taken, including a portable Yorx stereo. The apartment was ransacked, and a hole had been cut in her water bed.

Monnier reported the burglary to the police. The investigating officer discerned no signs of a forced entry. A bedroom window was open, but heavy dust and water spots did not appear to have been disturbed. He did not attempt to lift fingerprints.

During the last week of August, Bastian discovered the screen permanently affixed to the window on her kitchen door had been partially ripped away. There were no signs of entry into her apartment. Again, she failed to report the matter to police.

At approximately 4:30 a.m. on August 29, one of Monnier's neighbors heard screams. She looked out the window and saw Monnier's nude body, her torso bloodied. Police were immediately summoned.

The same officer who investigated the Monnier burglary two weeks earlier was dispatched to conduct another search of the victim's apartment. This time he noticed the bathroom window screen had been removed and was propped against the outside wall and the window was open. The bedroom window, which had been open, dusty, and water spotted after the first burglary, was now clean and closed.

A fingerprint expert removed numerous prints from the outside of the bedroom window and a kitchen window; they matched Yorba's. The bedding in the victim's bedroom was bloodstained; and a pillow, the headboard, and water bed had been damaged by a knife.

The victim's underwear had apparently been cut from her body and strewn about the room. Hairs were found on the bed and on the victim's

hands. Bloodstains were also found outside the apartment, leading to the spot where the body was discovered.

Bastian learned of the murder when she returned from a fishing trip later the same day and contacted the police. Yorba's latent fingerprints were removed from her kitchen window and sliding glass door.

Police obtained a search warrant for Yorba's apartment. He was arrested after he arrived home at approximately 4 a.m. on August 31, 1985. Tennis shoes which appeared to have been recently cleaned and a Yorx stereo were seized from his bedroom.

Police enlisted the aid of Yorba's probation officer, Charles Sisco, in making the arrest. Sisco rode with defendant to the Orange Police Department where, in a tape-recorded interview, the probation officer administered a *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974) warning; Yorba agreed to speak to him. Sisco left the room without questioning the suspect, but soon returned and gave the warning a second time. Yorba again waived his rights, and the interview began.

The officer investigating the murder had given Sisco a map purporting to show the locations of nine burglaries in the area. In truth, the police knew of only two, the Bastian and Monnier apartments. Yorba admitted burgling those two residences, but denied entering any of the others shown on the map.

Sisco deflected Yorba's occasional questions concerning the crimes for which he had been arrested until the officer investigating the homicide joined them. By then he had already admitted the July Bastian and early August Monnier burglaries. Under the police officer's questioning, Yorba stated he took a purse from Bastian's apartment and a television and stereo from Monnier's, where he also cut a hole in the water bed with a knife from the victim's kitchen; he admitted the stereo was still in his possession.

The police officer began to question him concerning the murder and stated (incorrectly) his fingerprints were found inside the victim's apartment. Yorba first insisted he wore gloves when he took Monnier's television and stereo. Later in the interview, he admitted he did not wear gloves but did return the same evening and, with gloves, attempted to remove his fingerprints with a bathroom towel. He said he had not been in the victim's apartment on any other occasion and denied the killing.

Pursuant to a search warrant, samples of Yorba's hair and blood were taken. The blood was subjected to two types of analysis, electrophoresis and

agglutination inhibition. Discrete bloodstains in the bed were consistent with the victim's and Yorba's blood characteristics. They were all inconsistent with those of Monnier's boyfriend. None of the hairs found on the bed or the victim matched Yorba's, however.

Yorba was tried as an adult. His sister's boyfriend testified under a grant of immunity. Although he could not remember the details by the time of trial, the witness refreshed his recollection with a transcript of a police interview two days after the murder. On the morning Monnier's body was discovered, while it was still dark, he was awakened by the sound of Yorba's bedroom window breaking. He ran to the room with a baseball bat, but the door was locked. He went outside and encountered a shoeless Yorba, dressed only in boxer shorts and a tank T-shirt. Yorba said he had locked himself out.

Yorba was convicted of burglary and attempted burglary of Bastian's apartment, two counts of burglary of Monnier's, and murder. A weapons allegation was found to be true as to the second Monnier burglary and the murder.

## II*

. . . . . . . . . . . . . . . . . . . .

## III

■ ■ ■ ■ ■ Yorba challenges the electrophoresis evidence, complaining experts in the scientific community have not yet reached a consensus regarding the reliability of the technique when applied to dried bloodstains in a forensic setting.[1] We disagree.[2]

---

\* See footnote, *ante*, page 1017.

[1] Electrophoresis allows sophisticated typing of individual blood proteins and enzymes. A "test sample is placed on a gel medium in an ionized buffer solution. When an electric current is run through the solution, the sample separates and migrates on the medium into characteristic patterns. These are then fixed, dyed, and read visually by the analyst. [Citation.]" (*People* v. *Brown* (1985) 40 Cal.3d 512, 529 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

[2] As British author Margery Allingham observed, "Chemists employed by the police can do remarkable things with blood. They can find it in shreds of cloth, in the interstices of floor boards, on the iron of a heel, and can measure it and swear to it and weave it into a rope to hang a man." (Allingham, The Tiger in the Smoke (1952).)

■■■■ Not long ago, the reliability of forensic electrophoresis under the *Kelly/Frye* standard was in doubt.[3] In *People* v. *Brown, supra,* 40 Cal.3d 512, the California Supreme Court rejected the prosecution's attempt to establish a consensus in the scientific community regarding the reliability of the procedure in forensic settings. Other jurisdictions have divided on the question. (See, e.g., *People* v. *Partee* (1987) 157 Ill.App.3d 231 [511 N.E.2d 1165, 1185] [finding electrophoresis to be generally accepted in the scientific community and collecting cases from other jurisdictions]; *People* v. *Young* (1986) 425 Mich. 470 [391 N.W.2d 270, 286, 66 A.L.R.4th 545] [disapproving electrophoresis but concluding the trial court's error in accepting it was harmless].)

■ Science, like time, marches on, however; and *People* v. *Reilly* (1987) 196 Cal.App.3d 1127 [242 Cal.Rptr. 496] has resolved the issue in this state for now. In *Reilly* the Court of Appeal concluded the prosecution demonstrated a sufficient consensus in the scientific community regarding the reliability of electrophoresis in the typing of dried bloodstains. An extensive array of experts attested to the accuracy of the technique in forensic settings. Conceding "potential problems of degradation, spoilage, and contamination," the majority of the experts nevertheless concluded these drawbacks did not render the process unreliable. (*Id.,* at p. 1150.) The court held absolute unanimity of views in the scientific community is not required; only a "clear majority" of the scientific community must support the method. (*Id.,* at p. 1148.)

The Supreme Court has approved the *Reilly* holding in dictum. (*People* v. *Coleman* (1988) 46 Cal.3d 749, 779, fn. 23 [251 Cal.Rptr. 83, 759 P.2d 1260].) And it has been followed by at least one other appellate panel. (*People* v. *Morris* (1988) 199 Cal.App.3d 377, 383 [245 Cal.Rptr. 52].) We are also satisfied electrophoretic testing of dried bloodstains is scientifically reliable.

Despite *Reilly,* Yorba contends the electrophoresis results should not have been admitted because the prosecution produced but a single expert below.[4] ■ As *Kelly* instructs, however, "once a trial court has admitted

---

[3] The admissibility of expert testimony based on a new scientific technique is governed by the *Kelly/Frye* rule. (See *People* v. *Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014.) First, the reliability of the method must be established; next, the witness providing the testimony must qualify as an expert on the subject; and finally, "the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case." (*People* v. *Kelly, supra,* at p. 30.)

[4] At trial defense counsel stipulated the prosecution's criminalist possessed the appropriate knowledge and experience to conduct the electrophoretic testing and followed the standard procedures as outlined in her testimony and exhibits. Dr. George Sensabaugh, a leading proponent of electrophoresis, who has testified on the subject in several jurisdictions, including

evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*People* v. *Kelly, supra,* 17 Cal.3d at p. 32.) Yorba offered no such evidence; and the debate, for the time being, is over. The trial court did not err.

IV

██ ██ ██ ██ ██ Yorba raises similar complaints concerning admission of the bloodstain analysis based on agglutination inhibition testing.[5] But the prosecution adequately established the scientific community's acceptance of this technique, and we reject the challenge.

Two prosecution witnesses explained this process at a *Kelly/Frye* hearing: Moses Schanfield, Ph.D., a genetics professor, and Gary Harmor, a forensic serologist who performs laboratory testing and consulting services in criminal cases. Based upon their testimony, the court ruled the agglutination inhibition method was generally accepted by the scientific community and met *Kelly/Frye* standards.

Harmor recounted his professional education, training, and experience in forensic serology and his connection with a northern California laboratory performing forensic testing. He explained he checked for four of the eighteen different markers in the GM class and two markers in the KM class. Markers within each class are independent of one another, and simple multiplication of the respective frequencies yields a combined population frequency statistic for an individual sharing both characteristics.

Commercially prepared reagents are purchased for the tests, and numerous internal control measures ensure each stage is conducted properly.

California, also reviewed her documentation; in his opinion, the criminalist performed "the electrophoretic run . . . correctly, and the . . . results are reliable and accurate."

[5] The agglutination inhibition process detects the presence of specific genetic markers in the bloodstream. Blood samples are dissolved in a saline solution and centrifuged to remove debris; a liquid remains. A chemical known as an "agglutinator" is added to determine the presence of a specific genetic marker. If the marker is present, the agglutinator will chemically bind with it and neutralize.

To discover whether this has occurred, antigen-coated indicator cells are added to the extract; these cells react only to the specific agglutinator used. There is no reaction if the agglutinator has neutralized. If it has not, however, the indicator cells clump together; and it is then known that the sample does not contain the particular genetic marker tested. Separate tests determine the presence of other genetic markers.

Harmor noted many respected forensic laboratories rely on the procedure: the New York City Medical Examiners Office Serology Unit, the Center for Forensic Sciences in Toronto, the Illinois State Department for Forensic Sciences, the Forensic Sciences Service in Signal Hill, the Minnesota Department of Justice, the Federal Bureau of Investigation, and Dr. Moses Schanfield's laboratory in Atlanta. In his opinion, the general scientific community considers the agglutination inhibition method of typing dried bloodstains valid and reliable; he was unaware of any criticism of or objection to the test. Defense counsel did not take issue with his qualifications as an expert on the technique or produce contradictory testimony.

Dr. Schanfield testified as an expert in human genetics. He has used the agglutination inhibition method extensively, performing the test "a million times, plus or minus 100,000." Schanfield has also conducted research in the area and noted, "In immunological terms . . . it's relatively an old procedure." According to him, researchers have accurately and reliably typed dried blood samples decades old. He was not aware of any evidence or research suggesting the GM/KM markers were unstable. He also indicated potential problems with contamination could be avoided by proper sample preparation and in his experience no chemicals found in nature could alter the genetic structure of these markers. Schanfield opined the scientific community generally accepted the technique as a valid and reliable method of typing dried genetic blood markers. He added, the "GM and KM are extremely well-accepted and respected on a world wide basis."

Neither party cites, and our independent research has not revealed, any published authority concerning the admissibility of forensic agglutination inhibition evidence. Nevertheless, the uncontradicted testimony established the test has been performed by scientists around the globe for many years with a high degree of accuracy. Consequently, the record supports the trial court's conclusion that the scientific community accepts agglutination inhibition as a valid and reliable scientific technique.

## V

■ Finally, Yorba contends the trial court abused its discretion in admitting population frequency statistics to complement the bloodstain analyses. These numbers, he argues, are irrelevant because they cannot definitively identify a specific person as the source of a particular blood sample. He also claims the admission of statistical evidence may mislead the

jury by suggesting a mathematical probability of guilt.[6] (*People v. Collins* (1968) 68 Cal.2d 319 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].)

The Attorney General counters defense counsel's failure to properly object to the evidence at trial deprives Yorba of the opportunity to raise the issue now. The point need not detain us: We give Yorba the benefit of any doubt concerning preservation of the question on appeal but reject the contention on the merits. (Cf. *People v. Coleman, supra,* 46 Cal.3d at pp. 776-779.)

*People v. Brown, supra,* 40 Cal.3d 512 supports the admissibility of such data: "[B]oth California and the majority of other jurisdictions have traditionally admitted statistical blood-group evidence of this kind in criminal cases, even where it simply includes the accused within the class of possible donors. [Citations.]" (*Id.,* at p. 536, fn. 6; *People v. Lindsey* (1978) 84 Cal.App.3d 851, 863-866 [149 Cal.Rptr. 47, 2 A.L.R.4th 485]; *People v. Vallez* (1978) 80 Cal.App.3d 46, 56 [143 Cal.Rptr. 914]; see also *United States v. Gwaltney* (9th Cir. 1986) 790 F.2d 1378, 1382-1383; *State v. Bauer* (1984) 210 Mont. 298 [683 P.2d 946, 950-951]; *State v. Pearson* (1984) 234 Kan. 906 [678 P.2d 605, 610, 618]; *State v. Washington* (1981) 229 Kan. 47 [622 P.2d 986, 994-995]; *State v. Garrison* (1978) 120 Ariz. 255 [585 P.2d 563, 566]; *Gonzalez v. State* (Tex.App. 1982) 643 S.W.2d 751, 752-753; *State v. Spann* (1987) 219 N.J.Super. 85 [529 A.2d 1039, 1041]; *State v. Kelly* (1986) 207 N.J.Super. 114 [504 A.2d 37, 40-42].)

*People v. Collins, supra,* 68 Cal.2d 319 is not to the contrary. There, the prosecutor used a mathematics instructor's testimony based on the physical characteristics of a couple who committed a crime and their getaway vehicle to argue the probability that such a duo in such a car would appear at a given moment was one in twelve million. Concluding this deduction was not based on statistical data gleaned through scientific research and experiment, but on statistical theory unsupported by any evidence, the Supreme Court reversed: The "specific technique presented . . . suffered from two basic and pervasive defects—an inadequate evidentiary foundation and an inadequate proof of statistical independence." (*Id.,* at p. 327.) Neither flaw is present here. Yorba's arguments go to the weight, not the admissibility, of

---

[6]Using population frequency data, Harmor computed the particular combination of GM and KM markers present on the bloodstain would be found in 4.6 percent of Caucasians, 14 percent of Hispanics, 8.9 percent of Blacks, and 7 percent of Asians. Indicating the genetic markers used in the agglutination inhibition method were independent from the enzyme genetic markers determined through electrophoresis, Harmor multiplied the figures from each test to reach an overall population frequency statistic. Schanfield confirmed Harmor's computations.

the evidence. The court did not abuse its discretion in receiving the population frequency statistics. (See *People* v. *Morris, supra,* 199 Cal.App.3d at p. 391.)

Judgment affirmed.

Scoville, P. J., and Wallin, J., concurred.